# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brandon Morgan, : 
               Petitioner : 
                : 
        v. : Nos. 691 & 692 C.D. 2019
            : Submitted: February 7, 2020
Unemployment Compensation : 
Board of Review, : 
             Respondent : 

BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ELLEN CEISLER, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**          **FILED: May 29, 2020**

Petitioner Brandon Morgan (Claimant), *pro se*, petitions for review of two orders of the Unemployment Compensation Board of Review (Board). The Board affirmed as modified an Unemployment Compensation Referee's (Referee) decisions, in which the Referee concluded that Claimant was ineligible for unemployment compensation benefits under Sections 401(c) and 402(b) of the Unemployment Compensation Law (Law)[1]. The Board also affirmed as modified

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§ 801(c), 802(a). Section 401(c) of the Law provides that, in order to be eligible for unemployment compensation benefits, a claimant must make "a valid application for benefits . . . in the proper manner . . . prescribed by the [Pennsylvania Department of Labor and Industry (Department)]." Section 402(b) of the Law provides, in part, that a claimant "shall be ineligible

the Referee's determinations that Claimant received overpayments pursuant to Section 804(a)-(b) of the Law[2] in the amounts of $516.00 and $4,644.00, respectively. We now affirm.

Claimant filed a claim for unemployment compensation benefits effective August 26, 2018, which unemployment compensation authorities (UC Authorities) granted. (Reproduced Record (R.R.) at 2a-3a.) Thereafter, UC Authorities continued to receive and pay claims filed by Claimant. (*Id.*) On September 11, 2018, Claimant received a written conditional offer of employment with Valley Youth House, Inc. (Employer). (*Id.* at 33a, 101a-02a.) From September 14-19, 2018, Claimant attended various staff training events with Employer. (*Id.*) On September 19 or 20, 2018, Claimant voluntarily terminated his employment with Employer. (*Id.* at 96a.) Claimant applied for unemployment compensation benefits for the week ending September 22, 2018, and received benefits in the amount of $516.00 for that week. (*Id.* at 3a.) Claimant continued to apply for and receive unemployment compensation benefits through the week ending December 1, 2018. (*Id.*)

On December 17 and 18, 2018, the Harrisburg UC Overflow Center (UC Service Center) issued Claimant a total of four notices of determinations. (*Id.* at 52a-60a.) The first two determinations pertained to the time period from the claim week ending September 22, 2018, to the claim week ending December 1, 2018. In

---

for compensation for any week" in which the claimant's "unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature."

[2] 43 P.S. § 874(a)-(b). Section 804(a) of the Law provides that a claimant who, by reason of his fault, receives unemployment compensation benefits to which the claimant is not entitled must repay the amount received with interest. Section 804(b) of the Law provides that a claimant who receives such an overpayment *not* by his fault need not repay the overpayment, but is liable to have the overpayment deducted from future benefits to which the claimant is entitled.

2

those determinations, the UC Service Center: (1) denied benefits to Claimant because he failed to show a necessitous and compelling reason for voluntarily quitting his employment; and (2) established a fault overpayment in the amount of $4,644.00 (collectively, the Quit Determinations). (*Id.* at 52a-55a.) In the final two determinations, which pertained only to the week ending September 22, 2018, the UC Service Center (1) denied benefits to Claimant because he failed to report his work for Employer during the week ending September 22, 2018; and (2) established a fault overpayment in the amount of $516.00 (collectively, the Report Determinations). (*Id.* at 57a-59a.)

On December 31, 2018, Claimant filed two separate appeals—one for the Quit Determinations and one for the Report Determinations. (*Id.* at 62a-71a.) A Referee consolidated the appeals and conducted a hearing on January 25, 2019. (*Id.* at 84a.) During the hearing before the Referee, Claimant testified that, after interviewing with Employer for a position as coordinator of one of its residential childcare facilities, he filled out hiring paperwork and attended several sessions of training with Employer. (*Id.* at 89a-90a.) Claimant later asserted that he did not think he would be paid for the training. (*Id.* at 91a.) Claimant further testified that, while at his assigned facility for training, he witnessed events or circumstances that made him feel "insecure" about his own and the children's safety. (*Id.* at 90a.) Claimant later clarified that he witnessed children discussing suicide in the facility to which he was assigned. (*Id.* at 93a.) He explained that, because he believed he was required by law to report what he saw, he contacted ChildLine.[3] (*Id.* at 90a, 94a.) He also claimed that he discussed his concerns with his friends who, he conceded,

---

[3] ChildLine is an organizational unit of the Pennsylvania Department of Human Services that operates a statewide toll-free system for receiving and maintaining reports of suspected child abuse, along with making referrals for investigation. 55 Pa. Code § 3490.4.

3

are not employees of Employer but serve as landlords for the residential facility to which Claimant was assigned. (*Id.* at 90a, 95a.) Claimant asserted that he later heard that his friends had spoken with Employer's CEO about his concerns. (*Id.* at 95a.)

Claimant confirmed that he resigned his employment with Employer on September 19 or 20, 2018, after he became concerned about safety, made his report to ChildLine, and discussed his concerns with his friends. (*Id.* at 96a.) When Employer's witness at the hearing asked Claimant why he did not allow more time for Employer to resolve his alleged concerns, Claimant offered no explanation. He merely stated that he "didn't want to take any further step with [Employer]." (*Id.* at 97a.) Claimant testified that in early November 2018, he received a check from Employer for $738.46. (*Id.* at 91a-92a.) He claimed that, sometime after receiving the check, he contacted UC Authorities to report that he had received income.[4] (*Id.*)

Employer's witness testified that Employer provided a written offer of employment to Claimant on September 11, 2018, and entered him into Employer's payroll system on September 14, 2018. (*Id.* at 101a-02a.) She explained that Claimant's paycheck was delayed because Claimant never signed in on Employer's payroll timekeeping system. (*Id.* at 101a.) Employer's witness also testified that no employees of Employer learned of Claimant's safety concerns until after receiving notice of Claimant's unemployment compensation claims. (*Id.* at 100a.) Employer's witness, who is vice president of human resources for Employer,

---

[4] In his testimony before the Referee, Claimant did not specify the date(s) on which he allegedly contacted UC Authorities about his pay. In a questionnaire completed December 10, 2018, and entered into the record at the hearing, Claimant stated that the alleged contact occurred on November 28 and December 1, 2018. (R.R. at 34a.)

4

emphasized that Employer would have begun an investigation immediately if any of its employees had become aware of Claimant's concerns. (*Id.* at 100a-01a.)

Following the hearing, the Referee issued two decisions. The first decision affirmed the Quit Determinations but modified the amount of the related fault overpayment, increasing it from $4,644.00 to $5,160.00.[5] (*Id.* at 109a.) The Referee determined that Claimant voluntarily quit his employment, failed to establish a necessitous and compelling reason for doing so, and culpably failed to report his employment and subsequent termination thereof, resulting in a fault overpayment. In the second decision, the Referee affirmed the Report Determinations without modification. (*Id.* at 113a.) In doing so, the Referee determined that Claimant intentionally avoided reporting his employment with Employer on his benefit application, thus failing to make a proper application under Section 401(c) of the Law and resulting in a fault overpayment.

Claimant appealed to the Board, which affirmed the Referee's decisions with modification. (*Id.* at 131a-37a.) In its first decision and order, pertaining to the Quit Determinations, the Board reduced the overpayment amount back to $4,644.00 and determined that the overpayment was nonfault only. (*Id.* at 132a-33a.) In so doing, the Board made the following relevant findings of fact:

1. Effective August 26, 2018, [Claimant] applied for unemployment compensation benefits.
2. [Claimant's] friend was renting property to [Employer] . . . and suggested [C]laimant apply.

---

[5] It appears that the Referee increased the relevant fault overpayment by $516.00 to account for the fact that "the UC Service Center did not include [the] claim week ending September 29, 2018 in the [Quit Determination o]verpayment. . . ." (R.R. at 108a.) It is not clear why the UC Service Center did not make that week subject to the Quit Determinations.

3. [Claimant] applied and, on September 11, 2018, was given a conditional offer letter [from Employer] to be a full-time residential coordinator.

4. [Claimant] was placed on [Employer's] payroll beginning September 14, 2018, when he attended a staff retreat picnic, for which he earned $184.56.

5. On September 17 and 18, 2018, [Claimant] attended off-site orientation.

6. On September 19, 2018, [Claimant] participated in on-site training.

7. On September 19, 2018, [Claimant] quit due to allegedly witnessing neglect in the workplace.

8. [Claimant] notified his friend, but not [Employer], of the alleged neglect.

. . . .

10. [Claimant] did not notify the Department . . . of his work for or resignation from [Employer] because he believed it was just training, not employment.

11. For the weeks ending October 6 through December 1, 2018, [Claimant] filed claims for and received $4[,]644.00 in benefits because he did not advise the Department of his work for or resignation from [Employer].

(*Id.* at 131a-32a.)

In concluding that Claimant was ineligible for unemployment compensation benefits under Section 402(b) of the Law and that he had received a nonfault overpayment, the Board reasoned, in part:

> [Claimant] quit due to allegedly witnessing neglect in the workplace. [Claimant] provided no specificity about the . . . neglect he allegedly witnessed for the Board to determine whether it was a necessitous and compelling reason to quit. Further, [Claimant] did not advise [Employer] of his concerns, enabling it an opportunity to rectify them, before quitting. Therefore, benefits must be denied under Section 402(b) of the Law.
>
> . . . .

6

> . . . [Claimant's] mistaken belief that he was not employed does not establish that he was at fault for receiving these benefits, so they may be recouped under Section 804(b) of the Law.

(*Id.* at 132a-33a.)

In its second decision and order, pertaining solely to the Report Determinations, the Board affirmed the Referee's decision. In so doing, the Board made the following relevant findings of fact:

2. The unemployment compensation handbook advised [Claimant], "If you return to work full time with your former employer or a new employer, you are no longer eligible for benefits" and "IMPORTANT: Notify the UC service center immediately if you begin working part time at a new employer."

. . . .

4. [Claimant] . . . , on September 11, 2018, was given a conditional offer letter to be a full-time residential coordinator [for Employer].

5. [Claimant] did not promptly advise the Department . . . of his new full-time employment.

6. For the week ending September 22, 2018, [Claimant] worked for [Employer] and earned $553.68.

7. For the week ending September 22, 2018, [Claimant] filed a claim for benefits and advised the Department that he did not work.

8. For the week ending September 22, 2018, [Claimant] received $516.00 in benefits because he advised the Department he did not work.

9. Because [Claimant] did not stay long enough to be entered into the timekeeping system, his pay [from Employer] was not automatically generated.

10. [Claimant's] pay[]check was not generated until October 23, 2018.

11. In the first week of November 2018, [Claimant] received a $738.46 pay[]check from [Employer].

12. [Claimant] did not notify the Department of this pay.

7

> 13. On November 19, 2018, the Department became aware of [Claimant's] work for [Employer] through the National Directory of New Hires.

(*Id.* at 135a-36a.)

In concluding that Claimant was ineligible for unemployment compensation benefits under Section 401(c) of the Law and had received a fault overpayment, the Board reasoned, in part:

> For the week ending September 22, 2018, [Claimant] worked in what should have been a full-time job, but did not advise the Department. [Claimant] alleged he did not realize he was an employee because [the activity] was merely training and was not paid. [E]mployer credibly established that [Claimant] was presented with a conditional offer letter, which [Claimant] accepted, and [Claimant] was paid for the work performed.
>
> Although [Claimant] argues that he advised the Department of his work and of his belated paycheck, the Board discredits these assertions. Further, [Claimant] wrote a statement to the Department that he "spoke with two different UC representatives on . . . two separate occasions to clarify this situation [regarding the late pay on] November 28th and December 1st." Considering that [Claimant] testified he received this paycheck in the first week of November 2018 . . . , this disclosure, even if believed, would be too late to salvage [Claimant's] case.
>
> The Board concludes that [Claimant] intentionally misrepresented his employment status when filing a claim for benefits, so he must be ineligible under Section 401(c) of the Law, regardless of whether he was "unemployed" under Section 4(u) of the Law[, 43 P.S. § 753(u)].
>
> . . . .
>
> . . . Because [Claimant] intentionally misrepresented his employment status when filing a claim for benefits, he is at fault for receiving these benefits and they must be repaid under Section 804(a) of the Law.

(*Id.* at 136a-37a.)

8

On appeal,[6] Claimant essentially argues that the Board committed an error of law in concluding that Claimant did not prove a necessitous and compelling reason for voluntarily terminating his employment. Claimant also argues that the Board erred in concluding that he failed to comply with Section 401(c) of the Law. Finally, Claimant argues that the Board erred because it failed to make sufficiently specific factual findings to assess a fault overpayment.

Whether a claimant had cause of a necessitous and compelling nature for leaving work is a question of law subject to this Court's review. *Brunswick Hotel & Conference Ctr., LLC v. Unemployment Comp. Bd. of Review*, 906 A.2d 657, 661 (Pa. Cmwlth. 2006). A claimant who voluntarily terminates his employment "bears the burden of proving that necessitous and compelling reasons motivated that decision." *Fitzgerald v. Unemployment Comp. Bd. of Review*, 714 A.2d 1126, 1129 (Pa. Cmwlth. 1998), *appeal denied*, 794 A.2d 364 (Pa. 1999). To establish cause of a necessitous and compelling nature, a claimant must establish: (1) circumstances existed that produced real and substantial pressure to terminate employment, (2) like circumstances would compel a reasonable person to act in the same manner, (3) the claimant acted with ordinary common sense, and (4) the claimant made a reasonable effort to preserve his employment. *Procito v. Unemployment Comp. Bd. of Review*, 945 A.2d 261, 264 (Pa. Cmwlth. 2008) (en banc).

Claimant essentially argues that it was necessary for him to quit his job out of fear for the safety of the children served by Employer and "concern" for his own professional reputation if he continued to work for Employer under circumstances

---

[6] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

involving alleged child neglect. (Petitioner's Br. at 19.) The Board and Employer[7] argue that Claimant failed to meet his burden, because he did not sufficiently describe any reasons for his concerns or fears before the Referee but instead made nonspecific, conclusory statements that conditions were unacceptable. The Board also emphasizes Claimant's admission that he spoke only to his friends—not to Employer—about his concerns, and that he did not discuss his concerns with anyone until the day before he voluntarily quit.

We agree with the Board and Employer that Claimant failed to establish a necessitous and compelling reason to quit. Although safety concerns may give rise to such reasons, the claimant must "demonstrate[] by objective evidence" that the workplace is actually unsafe, and "'fears' alone do not constitute a compelling reason to resign." *Green Tree Sch. v. Unemployment Comp. Bd. of Review*, 982 A.2d 573, 578 (Pa. Cmwlth. 2009). Here, Claimant offered no objective evidence that the conditions of his employment were unsafe, either for himself or for the children served by Employer. Accordingly, Claimant failed to demonstrate circumstances that exerted real and substantial pressure on him to terminate his employment.

Even if Claimant had made that showing, the Board found that Claimant did not notify Employer of his concerns. As Claimant has failed to challenge any of the Board's findings, we accept the Board's findings and conclude that Claimant failed to take reasonable steps to preserve his employment. The Board did not err,

---

[7] Employer has intervened in this proceeding on appeal.

10

therefore, in concluding that Claimant did not have a necessitous and compelling reason for voluntarily quitting his position with Employer.[8]

We next address Claimant's argument that the Board erred in concluding that he failed to comply with Section 401(c) of the Law. Under Section 401(c) of the Law, a claimant is eligible for unemployment compensation benefits only if his application for benefits is both "valid" and made "in the proper manner." We have long held that to satisfy Section 401(c), "[a] claimant seeking unemployment compensation benefits is required to divulge to [UC Authorities] all pertinent information regarding the claimant's employment status." *Amspacher v. Unemployment Comp. Bd. of Review*, 479 A.2d 688, 690 (Pa. Cmwlth. 1984). Although a claimant's failure to disclose pertinent information "does not technically result in an invalid application, . . . it does constitute a failure to submit the claim in the proper manner [as required by Section 401(c)]." *Smith v. Unemployment Comp. Bd. of Review*, 500 A.2d 186, 188-89 (Pa. Cmwlth. 1985); *see Myers v. Unemployment Comp. Bd. of Review*, 515 A.2d 1013, 1014 (Pa. Cmwlth. 1986).

Claimant argues that he did not withhold employment information on his application for the week ending September 22, 2018, because at the time he applied he mistakenly believed he would not be paid for the training he attended during that week. He also emphasizes that he did not actually receive any payment until many weeks after he applied for benefits. Regardless of these assertions, the Board

---

[8] In his brief, Claimant suggests that he informed a person whom he thought to be in charge. (Petitioner's Br. at 19-20, 22.) Even if we were to interpret this statement as challenging whether substantial evidence exists to support the finding that Claimant did not notify Employer of his concerns, our result would remain the same. A review of the record reveals that Claimant, during the hearing, admitted that he did not speak directly to any employee of Employer about his concerns and Employer's witness testified that Employer was never made aware of Claimant's concerns. (R.R. at 94a-96a, 100a.) Thus, substantial evidence exists to support the Board's finding that Claimant did not relay his concerns to Employer before quitting.

11

concluded that Claimant intentionally misrepresented his employment status on his application. The Board's findings—which Claimant has not challenged—support that conclusion. Claimant received a written offer of employment before he applied for benefits, and the record contains no evidence that Claimant ever informed UC Authorities of his pay, even after he received it. The Board discredited Claimant's assertions to the contrary.

Furthermore, despite Claimant's arguments, our decision in *Myers* is distinguishable. There, we held that a claimant was eligible for benefits even though she did not receive and report her earnings until after she applied for benefits. *Myers*, 515 A.2d at 1015. Critically, however, the Board in *Myers* found that (1) the employer had expressly told the claimant that she would not be paid for her work, and (2) when the claimant received pay anyway, she reported it to UC Authorities within 13 days of receipt. *Id.* at 1014. Based on those findings by the Board, we concluded that the claimant had no reason to believe she was employed at the time of her application because "employment" is necessarily remunerative as defined in Section 4(u) of the Act. *Id.* at 1015. Here, as we have explained, the Board made the opposite findings—that Employer informed Claimant of his employment relationship in writing, and that Claimant never informed UC Authorities of his pay. The Board permissibly relied on those findings to conclude that Claimant intentionally misrepresented his employment status on his application. The Board, thus, did not err in concluding that Claimant's application for benefits did not comply with Section 401(c) of the Law.

Finally, we address Claimant's argument that the Board did not make a specific factual finding regarding his fault or state of mind in order to support its determination of a fault overpayment. To the extent this argument differs from those

12

already addressed above, Claimant appears to argue that the Board erred in not including such a finding in its list of findings of fact. Claimant is correct that "[t]o find 'fault' under Section 804(a) [of the Law], there must be some finding by the . . . Board concerning [Claimant's] state of mind." *Amspacher*, 479 A.2d at 691. We have also held, however, that this standard is met where the Board finds that "the claimant was aware of his duty to report all earnings and did not do so." *Smith*, 500 A.2d at 189-90. Here, the Board made exactly those findings. Moreover, the Board expressly concluded, based on those findings, that "[Claimant] intentionally misrepresented his employment status" to UC Authorities. (R.R. at 137a.) The Board's assessment of a fault overpayment was, therefore, appropriate.

Accordingly, we affirm the orders of the Board.

P. KEVIN BROBSON, Judge

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brandon Morgan,                          :
                    Petitioner           :
                                         :
          v.                             :     Nos. 691 & 692 C.D. 2019
                                         :
Unemployment Compensation                :
Board of Review,                         :
                    Respondent           :

# **O R D E R**


AND NOW, this 29th day of May, 2020, the orders of the Unemployment Compensation Board of Review are hereby AFFIRMED.


 

P. KEVIN BROBSON, Judge